*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 17-BG-0877

IN RE MICHAEL L. AVERY, SR.

A Member of the Bar of the
District of Columbia Court of Appeals
(Bar Registration No. 447083)

FILED 08/2/2018
District of Columbia
Court of Appeals
Julio Castillo
Clerk of Court

On Report and Recommendation of the
Board on Professional Responsibility
(DDN-354-06)

(Argued June 27, 2018                                    Decided August 2, 2018)

*Michael L. Avery, Sr.*, pro se.

*Julia L. Porter*, Senior Assistant Disciplinary Counsel, with whom *Hamilton P. Fox, III*, Disciplinary Counsel, and *Jennifer P. Lyman*, Senior Assistant Disciplinary Counsel, were on the brief, for respondent

Before GLICKMAN, THOMPSON, and EASTERLY, *Associate Judges*.

PER CURIAM: An Ad Hoc Hearing Committee (the "Hearing Committee" or the "Committee") recommended that respondent Michael Avery be suspended for forty-five days for violations of several District of Columbia Rules of Professional Conduct in connection with his representation of a client, Mary Brown, in 2004 and 2005. The Board on Professional Responsibility (the "Board") recommended a forty-five-day suspension stayed in favor of six months of probation.

Respondent states that he disagrees with some of the Hearing Committee's and Board's findings, but he does not ask us to overturn any, and he takes no exception to the Board's recommended sanction. Disciplinary Counsel does not take exception to a forty-five-day suspension (although characterizing it as "particularly lenient"), but argues that respondent should be required to serve an actual suspension. Agreeing with the Board that this case is "most similar to those in which sixty-day suspensions were imposed" and acknowledging the assessment by the D.C. Bar Practice Management Advisory Service that respondent has made changes in his practice that "make an occurrence like that which gave rise to the bar complaint in 2004 very unlikely," but also concurring with Disciplinary Counsel that an actual period of suspension is warranted as a deterrent, we conclude that a sixty-day suspension, with thirty days stayed in favor of a one-year period of probation, is the appropriate sanction.

## I.

Respondent's law firm had a high-volume personal injury practice. Ms. Brown was injured in an automobile accident in November 2004. On November 10, 2004, she met with Adam Katzen, who was the only other attorney at the law

firm, and thereafter signed a retainer agreement to have respondent represent her in connection with her claim for damages arising out of the accident.

Respondent sent a letter to Ms. Brown dated January 25, 2005, advising her of the insurance settlement process. Thereafter, respondent did not himself handle Ms. Brown's claim but instead assigned it to Dawn Seegars, a paralegal in his office. On the same day, without waiting for further documentation from Ms. Brown, Ms. Seegars wrote GEICO, the responsible insurer, a "demand for settlement" and included a "specials" (i.e., special damages) package of medical bills totaling $2507. In March 2005, Ms. Brown provided her employment records to the law firm in support of her claim for lost wages, and in April 2005, Ms. Brown signed a lien for medical services provided to her by Kaiser Permanente and signed a release authorizing Kaiser to send her records to respondent. In June 2005, Kaiser notified respondent of the dollar amount of the lien. A month later, in July of 2005, Ms. Seegars sent GEICO a second settlement demand, indicating a "special damages" amount that did not include the full amount of the Kaiser-Permanente lien and omitting any claim for lost wages, hospital emergency room expenses, and damages for pain and suffering. The Hearing Committee found that no one at the law firm had discussed the settlement demand with Ms. Brown, and that she was not sent a copy of the letter.

On July 28, 2005, a GEICO claims examiner called Ms. Seegars to discuss settlement negotiations. During the phone call Ms. Seegars made a demand for $10,000, the claims examiner countered at $8800, and Ms. Seegars immediately accepted that settlement offer. The same day, the claims examiner sent respondent written confirmation of the settlement of Ms. Brown's claims along with a check for the agreed upon settlement amount. Once the check arrived, respondent's office manager endorsed Ms. Brown's name on the check (pursuant to the power-of-attorney provisions in the retainer agreement) and had it deposited in respondent's IOLTA account. The Hearing Committee found that "neither [r]espondent nor Ms. Seegars obtained Ms. Brown's consent to the July 28, 2005 settlement offer before it was accepted by Ms. Seegars." The Committee further found that Ms. Brown did not receive notice of the settlement, despite her many efforts to contact the law firm, until March 14, 2006, when Mr. Katzen called her. The Committee found that when Ms. Brown was informed of the settlement offer, she was "very upset" and told Mr. Katzen that the settlement amount was unacceptable, that she had never approved the settlement, and that she wanted the settlement check returned to GEICO and a lawsuit filed to recover her damages from the accident.

When Ms. Brown contacted the law firm on September 12, 2006, she was told that the firm "was 'in the process' of sending the check back." Respondent finally met with Ms. Brown for the first time on September 19, 2006, at which time he attempted to persuade her to accept the settlement amount. She did not do so, and this time she instructed respondent not to file a suit on her behalf. On September 25, 2006, she filed a complaint against respondent with the Office of Disciplinary Counsel. On October 10, 2006, respondent returned the settlement amount to GEICO, explaining, as reflected in telephone call notes made by a GEICO representative, that the money was being returned because "a paralegal (who no longer works for him) said M[s]. Brown had accepted the settlement when she had not. Therefore[,] Ms. Brown rejected the settlement and instructed the att[orney] to send the money back." Respondent told the Hearing Committee that this explanation to GEICO was not a true explanation, and that he "kn[e]w" (based on the policies of his office but not based on personal knowledge) that the case would not have been settled without authority from Ms. Brown.

The Hearing Committee found by clear and convincing evidence that respondent violated Rules 1.1 (a) (competence) and 1.1 (b) (skill and care) by "delegat[ing] day-to-day responsibility for Ms. Brown's case to his staff without maintaining familiarity with the matter and [without] proper oversight." The

Committee found that respondent was "disengaged" from the matter and "abdicated responsibility for his representation of his client," thereby failing to discover that his office had not "conduct[ed an] adequate investigation of Ms. Brown's injuries," had not considered whether to obtain medical reports "to determine the precise nature of her injuries," had not conveyed GEICO settlement offers to her, had not consulted with her before agreeing to a settlement, had deposited the GEICO check without obtaining a signed release from her, and had failed to notify her of the check and to send her a settlement disbursement sheet.

The Committee next found that respondent violated Rules 1.2 (a) (abiding by client's decisions), 1.4 (a) (duty to keep client reasonably informed), 1.4 (b) (duty to explain a matter to the extent reasonably necessary to permit the client to make informed decisions), and 1.4 (c) (failing to promptly notify client of settlement offer) by failing to communicate settlement offers to the client, accepting a settlement offer without her consent, failing (until after she had filed a disciplinary complaint) to comply with her instructions to rescind the settlement and return the settlement amount to the insurance company, filing a lawsuit on her behalf contrary to her instructions and without her knowledge,[1] and failing to

---

[1] The Hearing Committee found that respondent notified Ms. Brown by letter that he intended to file a lawsuit on her behalf because the statutory

(continued…)

communicate meaningfully with her (including by failing to explain to her the strengths and weaknesses of her case and to advise her of important developments).

The Committee found that respondent violated Rules 1.3 (a) (diligence and zeal) and 1.3 (c) (reasonable promptness) by failing to represent Ms. Brown diligently and to act with reasonable promptness (in the matters described above) and also by failing to compile a comprehensive list of damages, failing to timely return phone calls relating to the case, and failing to prepare to actually litigate.

In determining what sanction to recommend, the Hearing Committee took into account that while respondent's misconduct was serious, the misconduct arose out of a single representation, that respondent's demeanor showed that he "understood the seriousness of the issues," and that there was no allegation that

---

(…continued)

limitations period was about to expire, and that, having received no response to the letter, respondent filed a civil complaint against both the owner and driver of the car and GEICO, purportedly on Ms. Brown's behalf. The Hearing Committee also found that "unbeknownst to [r]espondent," Ms. Brown had retained another attorney, who had already filed a lawsuit against the owner and driver on her behalf. The complaint filed by respondent was eventually dismissed after respondent filed a motion to withdraw and failed to effect service of process.

Ms. Brown was actually prejudiced by respondent's misconduct.[2] But the Committee also found "troubl[ing]" and "significant aggravating factor[s]." The Committee found that respondent made misrepresentations to Disciplinary Counsel when he responded to Ms. Brown's complaint, "mischaracterizing the $8,800 payment from GEICO as a [mere] settlement *offer* and . . . giving the misleading impression that he had met with Ms. Brown to discuss the offer soon after it was made" (even though he did not meet with Ms. Brown until a year and a half later). (emphasis added). Further, the Hearing Committee found that respondent's testimony that Ms. Brown had approved the settlement ("despite all evidence pointing to the contrary conclusion") was "not credible," that respondent "essentially conceded that he had lied to GEICO 'in an effort to protect [his] client's interest,'" and that respondent "falsely testified" before the Committee when he told the Committee that his statement to GEICO was itself a lie. The Committee also cited as an aggravating factor the fact of respondent's prior discipline (a public censure in 2007 for incompetence, neglect, and failure to communicate with a client), but reasoned that the prior discipline was "not as aggravating as if the conduct had taken place[] after [respondent] had already been

_____

[2] This was presumably because GEICO agreed to accept the returned settlement amount and because the successor attorney filed a lawsuit on Ms. Brown's behalf before the statutory limitations period had run.

through a disciplinary proceeding."[3] The Hearing Committee ultimately recommended that respondent be suspended for forty-five days and be required to undergo an assessment by the D.C. Bar Practice Management Advisory Service as a condition of reinstatement.

The Board majority adopted the Hearing Committee's findings of fact and conclusions of law, with the exception that the majority disagreed with the Hearing Committee's conclusion that respondent did not violate Rule 1.15 (b) (now 1.15 (c)) (failure to promptly notify client of receipt of funds). The Board majority disagreed with the Hearing Committee's recommended sanction, however, because — after the Hearing Committee's recommendation was issued and before the Board made its recommendation — respondent had arranged for the Practice Management Advisory Service to conduct an assessment of his firm "to ensure that mistakes [like those] that happened in the handling of Ms. Brown's case d[id] not recur."

---

[3] The Hearing Committee rejected respondent's argument that "the passage of time between the underlying events and the hearing should mitigate any sanction imposed," finding that the delay did not "prejudice[] [r]espondent's ability to defend himself." Ms. Brown died before the Committee hearing commenced but after the parties had what the Board found was "ample opportunity to interview her."

In a February 15, 2017, letter detailing the results of that assessment, the D.C. Bar Assistant Director for the Practice Management Advisory Service stated that respondent was "operating a very effective law firm and employing excellent management tools" and that "[i]t [wa]s apparent . . . that the policies and procedures [respondent had] in place in [his] firm, the team approach [respondent] employ[s] in handling cases, [and] the lower volume and [respondent's] direct involvement in each case make an occurrence like that which gave rise to the bar complaint in 2004 very unlikely." Taking into account that assessment, the lack of prejudice to the client, what the Board observed to be respondent's contrition, and respondent's having acted on the recommendation to have a Practice Management Advisory Service review, the Board concluded that there was "significant[] mitigat[ion]." The Board therefore recommended a forty-five-day suspension stayed pending six months of probation.[4] The Board made that recommendation even though it found "the case against [r]espondent . . . most similar to those in which sixty-day suspensions were imposed."

---

[4] Board Chair Robert C. Bernius wrote separately, joining the Board's report and recommendation "except for the conclusion that [r]espondent's conduct violated [then] Rule 1.15 (b)[] and the recommendation that his suspension be stayed in its entirety." Board member Mary Lou Soller agreed with Chair Bernius's separate statement.

Disciplinary Counsel takes exception to the Board's stay-in-favor-of-probation recommendation, asserting that the Board's recommended sanction "falls short of protecting the public and the profession." Disciplinary Counsel emphasizes that the Board majority made this recommendation despite adopting the Hearing Committee's findings that respondent made misleading statements to Disciplinary Counsel and testified falsely before the Hearing Committee. Disciplinary Counsel also argues that the Board majority "gave unwarranted consideration and weight to [respondent's] unsworn and uncross-examined profession of remorse and claim of voluntary remediation." Disciplinary Counsel asserts that respondent should "serve an actual suspension of at least 45 days." As noted above, respondent disagrees with some of the Hearing Committee's and Board's findings,[5] but does not ask us to reject any, and he takes no exception to the Board's recommended sanction.

## II.

This court "review[s] *de novo* the Board's legal conclusions and other legal questions, but we defer to the factual findings of the Hearing Committee and the

---

[5] Respondent asserts, for example, that he did not abdicate responsibility for the client, and he maintains that he did not testify falsely before the Hearing Committee.

Board 'unless they are unsupported by substantial evidence' in the record." *In re Speights*, 173 A.3d 96, 99 (D.C. 2017) (internal footnote omitted) (quoting D.C. Bar Rule XI, § 9 (h)(1)). Moreover, "we 'shall adopt' the Board's recommended disposition 'unless to do so would foster a tendency toward inconsistent dispositions for comparable conduct or would otherwise be unwarranted.'" *Id.* (quoting D.C. Bar Rule XI, § 9 (h)(1)). "But although we must give considerable deference to the Board's recommendations in these matters, the responsibility for imposing sanctions rests with this court in the first instance." *In re Chapman*, 962 A.2d 922, 924 (D.C. 2009) (internal quotation marks omitted). We will modify a recommended sanction if it "fails to achieve consistency with the prior opinions of this court." *In re Kennedy*, 542 A.2d 1225, 1229 (D.C. 1988). While "the purpose of imposing a sanction is not to punish the attorney, but to protect the public and the courts [and] safeguard the integrity of the profession," it is also to "deter respondent and other attorneys from engaging in similar misconduct." *In re Downey*, 162 A.3d 162, 170 (D.C. 2017) (internal quotation marks omitted).

We conclude that our resolution in this case is governed by our "mandate for consistency of sanctions." *In re Brown*, 851 A.2d 1278, 1280 (D.C. 2004). We find that the facts of this case are most similar to those of *In re Chapman*. Chapman neglected his client's case, 962 A.2d at 923, "made deliberately

dishonest statements to [Disciplinary] Counsel during its investigation," *id.* at 925, and gave testimony before the hearing committee that we found was susceptible to an interpretation that the testimony was either "not credible" (the Board's interpretation) or "deliberately dishonest" (Disciplinary Counsel's interpretation), *id.* at 925, 925 n.1. Chapman had no prior disciplinary history, but his neglect resulted in the client's case being dismissed, *id.* at 923, 927, and he "refused to take responsibility or show any remorse for his misconduct," *id.* at 927. We concluded that a sixty-day suspension, with thirty days stayed in favor of a one-year period of probation was an appropriate sanction. *Id.* Here, respondent neglected his client, made misleading statements to Disciplinary Counsel, and gave what the Hearing Committee and Board found was "not credible" or "false testimony." Unlike Chapman, respondent has a prior disciplinary history (involving violation of some of the same Rules involved here), but the Hearing Committee and the Board found that he understands the seriousness of the issues. On balance, we conclude that a sanction similar to the one we imposed in *Chapman* — a sixty-day suspension, with thirty days stayed in favor of a one-year period of probation — is warranted here as well.[6]

---

[6] *See also, e.g.*, *In re Outlaw*, 917 A.2d 684, 686, 689 (D.C. 2007) (imposing a sixty-day suspension for neglect and dishonesty). An additional reason for not deferring to the Board's recommended forty-five-day suspension is this court's observation, a number of years ago, that "[w]e are unaware of any case

(continued…)

"We are imposing the suspension in this case . . . because of the importance of making clear to the public that the legal profession and this court do not tolerate the kind of neglect and misrepresentation evident here." *In re Ontell*, 593 A.2d 1038, 1043 (D.C. 1991). But in imposing the suspension, we recognize that "clients, as well as respondent, may be prejudiced by respondent's having to give up his practice" during the suspension period. *Id.* Given the assessment by the Practice Management Advisory Service, we are satisfied that "the interests of the public, as well as fairness to the respondent, will best be accommodated if we allow respondent to begin his [thirty-day] suspension at any time within ninety days of our suspension order," "provided [that respondent's] clients and the attorneys for adverse parties are informed of his impending suspension." *Id.* "[A]dditional time before suspension . . . [may be] a help to clients and respondent alike either in resolving matters expeditiously, without need for new counsel, or in assuring that successor counsel can be enlisted with minimum disruption to pending matters." *Id.*

---

(…continued)
in which an attorney has been suspended in other than 30 day increments." *In re Landesberg*, 518 A.2d 96, 102 n.6 (D.C. 1986). The court further stated that "[w]hile there is nothing magic about 30 day increments, the Board's obligation is to recommend sanctions which foster consistency. A sanction that differs structurally from any sanction ever imposed can hardly be said to foster consistency." *Id.*

Because, as acknowledged by Disciplinary Counsel, respondent has already undertaken the Practice Management Advisory Service review, resulting in that office's assessment that he is not likely to repeat the misconduct for which we are suspending him,[7] the only condition we impose during the probationary period is that respondent comply with the Rules of Professional Conduct.

We therefore order that respondent Michael L. Avery, Sr., is suspended from the practice of law in the District of Columbia for a period of sixty days, with thirty days stayed in favor of one year of probation. The thirty-day period of actual suspension shall "begin on a date respondent selects — and reports in advance to [Disciplinary] Counsel — within ninety days after this court's suspension order," *id.*, provided that he has by that date filed the affidavit required by D.C. Bar Rule XI, § 14 (g). If a new complaint is filed against respondent before the end of the probationary period and such complaint results in a finding that respondent

---

[7] This assessment may be part of what Disciplinary Counsel criticizes as respondent's "unsworn and uncross-examined . . . claim of voluntary remediation." However, the Practice Management Advisory Service assessment is information that we deem reliable and that we may take into account for purposes of determining what sanction is appropriate. We have frequently directed respondents to "obtain an assessment from [the Practice Management Advisory Service] and comply with and implement any [Practice Management Advisory Service] recommendations." *In re Coleman*, 162 A.3d 159, 161 (D.C. 2017); *see also, e.g.*, *In re Murdter*, 131 A.3d 355, 362 (D.C. 2016).

violated the Rules of Professional Conduct, respondent will be required to serve the remaining thirty days of the suspension consecutively with whatever other sanction may be imposed on him in the new matter(s).  It is

*So ordered.*